Hatfield, Judge,
delivered tlie opinion of the court:
This is an appeal in a trade-mark opposition proceeding from the decision of the Commissioner of Patents (61 USPQ 53) reversing the decision of the Examiner of Interferences sustaining appellant’s notice of opposition and holding that appellee was not entitled to register the trade-mark “Thiosan” for use on agricultural and horticultural fungicides.
It appears from the record that appellee has used its mark on its goods since about June 2, 1942.
In its notice of opposition appellant alleged that it was the owner of the trade-mark “Thio-zin” for use on a fungicidal powder; that it had used its mark on its goods since about July 1934; and that it would be damaged by the registration of the mark “Thiosan” to the applicant (appellee).
Evidence was introduced by each of the parties.
It is conceded by counsel for appellee that appellant has used its mark on its goods since long prior to the use by appellee of its mark, and that if the goods of the respective parties possess the same descriptive properties, the marks are confusingly similar. Accordingly, the sole issue before us is whether the goods of the parties possess the same descriptive properties.
It appears from the record that the appellant company manufactures and sells several hundred different articles, including pharmaceuticals, medicinal preparations, drugs, insect powder, liquid soaps, cold cream, window cleaners, etc.; that the company also sells all equipment necessary for hospitals, doctors’ offices, and government institutions, including furniture, beds, sterilizers, surgical instruments, rubber goods, kitchen wear, cotton goods, and practically everything used in such offices or institutions; that appellant’s product on which it uses its trade-mark is a fungicide and is composed of 20 percent sodium thiosulphate anhydride, 10 percent zinc oxide, 29.8 *1230 percent boric acid, 0.2 percent chlortliymol, and 40 percent inert ingredients; that it is used as an “inhibitive dusting powder” for the prevention or recurrence of trycophyton infection of the feet, commonly known as “athlete’s foot”; that it is sold in two-ounce and seven-ounce containers, although, according to appellant’s witness George G. Ulmer, Jr., president and general manager, of the appellant company, his company would be glad to sell it in bulk or in large containers; that appellant’s fungicide is advertised by means of catalogues; that it is sold by appellant to wholesale drug houses, doctors, hospitals, government institutions, department stores, so-called “country general stores” distributors of miscellaneous merchandise, athletic teams, and golf clubs; that it is used in the locker rooms of golf clubs to be dusted on the feet as a preventative of “athlete’s foot” which is quite prevalent.
The witness Ulmer stated that the fungus which causes so-called “athlete’s foot” is sometimes obtained by walking on grass. In this connection, he said:
* * * The big trouble with the Japanese army, according to Government records, is the fact that they catch a fungus on account of walking barefooted on all these islands, and carry a can of powder to cure it.
The witness further stated that the active ingredient in appellant’s fungicide is sodium thiosulphate; that the ingredients in appellant’s product make it suitable for use as an agricultural or horticultural fungicide. In explanation of the latter statement, he stated that the effectiveness of both appellant’s and appellee’s product depends to a large extent “on the liberation of nascent sulphur, and in the action of sulphur in that form and in combination, it produces the effect of killing the fungus.” He stated, however, that, so far as he knew, the appellant company had never attempted to use its product as an agricultural or horticultural fungicide.
It appears from the record that the product on which appellee uses its mark “Thiosan” is in the form of powder; that it is mixed with water and used as a spray on turfed areas, principally putting greens on golf courses, for the prevention and control of so-called “brown patch” and “dollar spot” which are fungus diseases; that it is advertised in publications such as “Golfdom,” “Greens Keeper Reporter,” “Parks and Recreation,” and “Better Homes and Gardens”; that it is a nonmercurial fungicide composed of 50 percent tetramethyl thi-uramdisulfide and 50 percent inert ingredients; and that it is sold by appellee in drums or other containers in quantities of 5, 25, and 100 pounds to so-called “golf supply houses” which supply “golf clubs” with machinery, seed, insecticides, fertilizer, and fungicides.
In advertising its product, appellee cautions the user not to “inhale the dust nor allow the dust to accumulate on the skin. Irritations of the skin or even more serious physiological disturbances may result *1231 from failure to observe these precautions. Should you employ this product dry, wear a dry filter dust mask over the nose and mouth, changing the filter medium often enough to maintain filtering efficiency. Wash the dust promptly off the skin with plenty of soap and water.” Appellee also admonishes users of its product that “Those few people whose skins are sensitive to sulfur should not permit Thiosan to accumulate on the skin. With these occasional exceptions, Thiosan is considered relatively nonpoisonous to warm-blooded animals.” [Italics ours.]
Appellee’s witness Gilbert F. Miles, an employee of the appellee company and in charge o'f research in the development of fungicides, “particularly in the field of seed disinfection and soil disinfection,” testified that he made laboratory tests to determine the comparative values of appellant’s and appellee’s products as agricultural or horticultural fungicides; that on the basis of those tests he estimated that as to the fungus rhizocgonia solani, appellant’s product “Thio-zin” was about one-twentieth as effective as appellee’s product; that, as to the fungus fusarium nivale, appellant’s product was only about one-eightieth as effective as appellee’s product; and that, in his opinion, appellant’s fungicide would exert an insignificant action against fungi ■which attacked grass and other vegetation. The witness stated that appellee’s fungicide contained none of the active ingredients present in appellant’s fungicide, and that the “sulphur radical” was not its “active ingredient.”
In his decision holding that the goods of the respective parties possess the same descriptive properties, and sustaining appellant’s notice of opposition, the Examiner of Interferences stated, among other things, that, although the goods of the parties were substantially different, both were chemical preparations and fungicides used for the eradication of fungi; that the differences in their composition and use corresponded “merely to the particular fields of fungus control for which they are respectively intended”; and that the sale of such products under the same or similar trade-marks would be likely to cause purchasers to believe that the goods had the same origin.
In his decision reversing the decision of the Examiner of Interferences and holding that the goods of the parties do not possess the same descriptive properties and that, therefore, the similarity of the involved marks was immaterial, the Commissioner of Patents stated the facts as hereinbefore related, and, among other things, said:
The goods of the parties are noncompetitive, and neither can he substituted in use for the other. Both are chemical compositions, but they have no ingredients in common. Broadly speaking, both are fungicides; but so are a pickle barrel and a cigarette case both containers.
Obviously the generic name of an article does not necessarily determine its descriptive properties in relation to those of another article. The “distinguishing dissimilarity” between the goods “may rest not only in the ‘essential character *1232 istics’ of the goods themselves with reference to their form, composition, texture and quality, but may rest in the use to which they are put, the manner in which they are advertised, displayed and sold, and probably other considerations.” California Packing Corporation v. Tillman & Bendel, Inc., 17 C. O. P. A. 1048, 40 Fed. (2d) 108.
It will be observed that the first syllable of each of the marks in question is the word “thio.”
Webster’s New International Dictionary defines “thio” as “A combining form (also used adjectively) denoting the presence of sul-phur ; — used specif, to indicate that the oxygen of a compound is more or less replaced by sulphur,” and states that sulphur is used, among other things, for destroying fungi. The same authority defines “fungicide” as “Any substance that destroyes fungi.” Sulphur is, therefore, a fungicide.
The active ingredient in appellee’s fungicide is tetramethyl thiuram-disulfide, a chemical compound in which sulphur is undoubtedly combined with other chemicals. The sulphur, therefore, would not be expected to exist in a free state. However, inasmuch as in its advertisements appellee admonishes those whose skins are sensitive to sul-phur not to permit the dust from its fungicide to accumulate on the body, it is evident that sulphur must be present, at least at times, in a free or nascent state, otherwise there would be no occasion for appellee to warn users of its sulphur content.
It will be recalled that appellant’s witness Ulmer testified that the effectiveness of both appellant’s and appellee’s fungicides depends to a large extent “on the liberation of nascent sulphur.” If that statement is correct, it may be, although we do not intend to discuss the case from the standpoint of chemistry, that the molecules in appellee’s chemical compound become decomposed, thus liberating nascent sulphur.
Chemically the term “nascent” is defined as “the condition of an element at the moment of liberation from a compound, marked, as in the case of hydrogen or oxygen, by a chemical activity greater than the ordinary.” Webster’s New International Dictionary. See also Hackh’s Chemical Dictionary.
Owing to the similarity of the marks in question and inasmuch as the products of the respective parties are fungicides and are sold to “golf clubs,” one for use on the putting greens and the other for use as a dusting powder in locker rooms, we think there is likelihood of confusion as to the origin of the two products if sold under the involved trade-marks, and that if appellant’s product is sold in large containers, as it may well be, according to the testimony of appellant’s witness Ulmer, and the fungicides of the parties are stored in the same storeroom, as they are apt to be, there is also likelihood of appellee’s -product being used for that of appellant, thereby causing injury to the user thereof.
*1233 Were the marks of the parties identical, that is, had appellee adopted appellant’s trade-mark “Thio-zin” for use on its fungicide, we think that it could not reasonably be argued that the concurrent use of such mark on the fungicides of the parties would not be likely to cause confusion in the mind of the public, both as to the origin of the fungicides and as to the fungicides themselves. If our premise •is sound, and we think it is, it follows that the fungicides of the parties possess the same descriptive properties.
It is true, as stated by the Commissioner of Patents, that the products of the parties are not competitive. That fact in itself, however, is not controlling, as many articles, including chemical compounds, which possess the same descriptive properties are not competitive.
We have given careful consideration to the views expressed by the commissioner and to those urged upon us by counsel for appellee, but are of opinion, as was the Examiner of Interferences, that the goods of the parties possess the same descriptive properties; that the marks are confusingly similar; and that as appellant has used its mark “Trio-zin” on its goods since long prior to the use by appellee of the mark “Thiosan,” appellee is not entitled to the registration which it seeks.
For the reasons stated, the decision of the Commissioner of Patents is reversed.